IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

CHARLES J. FITZPATRICK,       §
Individually and on Behalf of §
All Others Similarly Situated, §
                              §
      Plaintiffs,             §
                              §
v.                            §    CIVIL ACTION NO. H-13-1649
                              §
UNI-PIXEL, INC., REED KILLION, §
and JEFFREY W. TOMZ,          §
                              §
      Defendants.             §

## MEMORANDUM OPINION AND ORDER

This action is brought against Uni-Pixel, Inc. (Uni-Pixel), Uni-Pixel's Chief Executive Officer ("CEO") and President, Reed Killion, and Uni-Pixel's Chief Financial Officer ("CFO"), Jeffrey W. Tomz, for alleged violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. §§ 78j(b), 78t(a) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, during a proposed class period beginning on December 7, 2012, and ending on May 31, 2013. Pending before the court is Defendants' Motion to Dismiss Plaintiffs' Amended Class Action Complaint (Docket Entry No. 24), and Lead Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiff's Class Action complaint which includes a request for leave to amend (Docket Entry No. 26). For the reasons stated below, the defendants' motion to dismiss will be granted in part and denied in part.

## I. **Procedural History and Alleged Facts**

Plaintiffs initiated this action on June 6, 2013, by filing a Class Action Complaint ("CAC"; Docket Entry No. 1) asserting claims for violations of §10(b) and §20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. On August 27, 2013, the court signed an Order Approving Stipulation Regarding Appointment of Lead Plaintiffs and Approval of Lead Plaintiffs' Selection of Co-Lead Counsel (Docket Entry No. 15) pursuant to which plaintiffs Ravi Shapira and Danee Thannoo were appointed lead plaintiffs for this and any subsequently filed consolidated actions. On September 13, 2013, the court entered a Joint Stipulation and [Proposed] Order Vacating Initial Pretrial and Scheduling Conference and Extending Time for the Filing of Lead Plaintiffs' Consolidated Class Action Complaint and Defendants' Responses Thereto (Docket Entry No. 17), pursuant to which Lead Plaintiffs were to file a Consolidated Class Action Complaint no later than November 8, 2013. On November 8, 2013, Lead Plaintiffs filed their amended CAC ("ACAC"; Docket Entry No. 18).

The ACAC alleges that Uni-Pixel is a production-stage company headquartered in The Woodlands, Texas, that makes performance engineered films for the lighting, display, and flexible electronics markets. Defendant Killion is Uni-Pixel's President and CEO; defendant Tomz is Uni-Pixel's CFO. The claims for violation of the federal securities laws asserted in the ACAC arise

2

from statements made about the UniBoss™ technology used to produce multi-touch sensors — now known as InTouch Sensors — for consumer products such as computer displays, laptops, tablets, and smartphones. Plaintiffs allege that during a proposed Class Period starting on December 7, 2012, and ending on May 31, 2013, defendants made false or misleading statements concerning third-party agreements, and Uni-Pixel's ability to produce UniBoss in sufficient amounts to commercialize the technology during 2013. The statements that plaintiffs allege were false and misleading occurred on three different dates: December 7, 2012, February 26, 2013, and April 30, 2013.[1] Plaintiffs argue that the statements at issue misled investors and analysts to believe that

> (1) there was significant interest in UniBoss, such that Uni-Pixel needed to ramp up capacity to meet demand; (2) UniBoss would be ready for commercial production in April 2013; (3) product yield was 70% by February 2013; (4) Uni-Pixel might be able to ship UniBoss product as early as June 2013; and (5) UniBoss would be on shelves by September 2013.[2]

Plaintiffs allege that

> Defendants Killion and Tomz signed the Class Period SEC filings containing these misrepresentations.      In

---

[1]Lead Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiffs' Class Action Complaint ("Lead Plaintiffs' Opposition"), Docket Entry No. 26, p. 15 (citing ACAC ¶¶ 61, 66-69 (Dec. 7, 2012 PC deal announcement); 74-79, 80-82, 83-86 (Feb. 26, 2013, press release, conference call, and Form 10-K); 107-109 (April 30, 2013, statement that UniBoss would reach store shelves in September and Form 10-Q "work in progress" figure).

[2]Id. at 15.

addition, Defendant Killion explicitly perpetuated this false information in various conference calls and press releases throughout the Class Period.[3]

Plaintiffs argue that the defendants' statements about UniBoss

were materially misleading because, at least into the Spring of 2013: (1) the UniBoss production process was changed daily because it did not work; (2) Uni-Pixel had trouble meeting sample deadlines, let alone production and capacity benchmarks; (3) Uni-Pixel could not make small patterns that were uniform and fully-conductive; (4) Uni-Pixel could not eliminate visible lines or the Moiré effect; (5) UniBoss was fragile and could be destroyed in testing; and (6) yields were in fact only 20-40%.[4]

## II. **Standards of Review**

Defendants argue that plaintiffs' ACAC should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for which relief may be granted because the factual allegations do not satisfy the pleading requirements of Federal Rule of Civil Procedure 9(b) or the Private Securities Litigation Reform Act ("PSLRA") set forth at 15 U.S.C. § 78u-4(b).[5]

---

[3]Id. (citing ACAC ¶¶ 5-7, 12, 18, 61, 74-76, 80-81, 97, 99, 105-108).

[4]Id. (citing ACAC ¶ 67(a)-(f)).

[5]Defendants' Motion to Dismiss Plaintiffs' Amended Class Action Complaint ("Defendants' Motion to Dismiss"), Docket Entry No. 24.

## A.    Federal Rule of Civil Procedure 12(b)(6)

A Rule 12(b)(6) motion tests the formal sufficiency of the pleadings and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001), cert. denied sub nom. Cloud v. United States, 122 S. Ct. 2665 (2002). The court must accept the factual allegations of the complaint as true, view them in a light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. Id. To defeat a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Twombly, 127 S. Ct. at 1965). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 127 S. Ct. at 1965. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Id.

5

(quoting <u>Twombly</u>, 127 S. Ct. at 1966).  Moreover, courts do not accept as true legal conclusions.

When considering a motion to dismiss courts generally are limited to the complaint and its proper attachments.  <u>Dorsey v. Portfolio Equities, Inc.</u>, 540 F.3d 333, 338 (5th Cir. 2008). Courts may also rely on "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." <u>Id.</u>  In securities cases courts may take judicial notice of the contents of public disclosure documents that are required by law to be filed with the Securities Exchange Commission ("SEC") and are actually filed with the SEC with the caveat that these documents may be considered only for the purpose of determining what statements they contain; not for proving the truth of their contents.  <u>Lovelace v. Software Spectrum Inc.</u>, 78 F.3d 1015, 1018 & n.1 (5th Cir. 1996)(citing and adopting rule of <u>Kramer v. Time Warner, Inc.</u>, 937 F.2d 767, 774 (2d Cir. 1991), and explaining that this rule does not apply to other forms of disclosure such as press releases or announcements at shareholder meetings).

**B.  Federal Securities Law**

Section 10(b) of the Exchange Act makes it unlawful for any person:

> To use or employ, in connection with the purchase or sale
> of any security . . . any manipulative or deceptive
> device or contrivance in contravention of such rules and
> regulations as the [SEC] may prescribe as necessary or

6

appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  Rule 10b-5 makes it unlawful for any person, directly or indirectly:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  To recover damages for violations of § 10(b) and Rule 10b-5, plaintiffs must prove

> (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2407 (2014) (quoting Amgen Inc. v. Connecticut Retirement Plans and Trust Funds, 133 S. Ct. 1184, 1192 (2013), and Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1317-18 (2011)).  Such claims are subject to pleading requirements of Rule 9(b) and the PSLRA. Lormand v. US Unwired, Inc., 565 F.3d 228, 239 (5th Cir. 2009).

1.  Federal Rule of Civil Procedure 9(b)

Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b). Plaintiffs must also plead the elements of their Rule 10b-5 claims with particularity. See Goldstein v. MCI WorldCom, 340 F.3d 238, 245 (5th Cir. 2003)(citing Williams v. WMX Technologies, Inc., 112 F.3d 175, 177 (5th Cir.), cert. denied, 118 S. Ct. 412 (1997)). Particularity is required so that the complaint provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims and then attempting to discover unknown wrongs. See Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1067 (5th Cir. 1994).

Pleading fraud with particularity in this circuit requires "the particulars of 'time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby.'" Id. at 1068 (quoting Tel-Phonic Services, Inc. v. TBS International, Inc., 975 F.2d 1134, 1139 (5th Cir. 1992)). See also Carroll v. Fort James Corp., 470 F.3d 1171, 1174 (5th Cir. 2006) (quoting United States ex rel. Riley v. St. Luke's Episcopal Hospital, 355 F.3d 370, 381 (5th Cir. 2004) ("In cases concerning fraudulent

misrepresentation and omission of facts, Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading.")). "A dismissal for failure to plead fraud with particularity as required by Rule 9(b) is a dismissal on the pleadings for failure to state a claim." Southland Securities Corp. v. INSpire Insurance Solutions, Inc., 365 F.3d 353, 361 (5th Cir. 2004) (citing Shushany v. Allwaste, Inc., 992 F.2d 517, 520-520 (5th Cir. 1993)).

    2.   Private Securities Litigation Reform Act

In 1995 Congress amended the Securities Exchange Act of 1934 through the passage of the PSLRA, 15 U.S.C. § 78u-4(b)(1). In relevant part, the PSLRA, provides:

(1)   Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges that the defendant--

    (A) made an untrue statement of a material fact; or

    (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2)   Required state of mind

> (A)  In general
>
> Except as provided in subparagraph (B), in any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.
>
> . . .
>
> (3)  Motion to dismiss; stay or discovery
>
> (A)  Dismissal for failure to meet pleading requirements
>
> In any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met.

15 U.S.C. § 78u-4(b).

In ABC Arbitrage Plaintiffs Group v. Tchuruk, 291 F.3d 336, 350 (5th Cir. 2002), the Fifth Circuit coalesced the pleading requirements in the PSLRA and Rule 9(b) into a succinct directive for litigants:

> [A] plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b-5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b) and 15 U.S.C. §§ 78u-4(b)(1) & 78u-4(b)(3)(A):
>
> (1) specify [that] each statement alleged to have been misleading, *i.e.*, contended to be fraudulent;
>
> (2) identify the speaker;
>
> (3) state when and where the statement was made;

(4) plead with particularity the contents of the false representations;

(5) plead with particularity what the person making the misrepresentation obtained thereby; and

(6) explain the reason or reasons why the statement is misleading, *i.e.*, why the statement is fraudulent.

This is the "who, what, when, where, and how" required under Rule 9(b) in our securities fraud jurisprudence and under the PSLRA. Additionally, under 15 U.S.C. § 78u-4(b)(1), for allegations made on information and belief, the plaintiff must:

(7) state with particularity all facts on which that belief is formed, *i.e.*, set forth a factual basis for such belief.

In <u>Indiana Electrical Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.</u>, 537 F.3d 527, 532-33 (5th Cir. 2008), the Fifth Circuit reiterated that the PSLRA heightened the pleading standards for private claims of securities fraud by requiring plaintiffs to allege with particularity why each one of defendants' representations or omissions was "misleading" under 15 U.S.C. § 78u-4(b)(1). The Fifth Circuit also held that the PSLRA heightened the pleading standards for private claims of securities fraud by requiring plaintiffs to plead with particularity those facts giving rise to a "strong inference" that the defendant acted with the required state of mind under 15 U.S.C. § 78u-4(b)(2). <u>Id.</u> In <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 127 S. Ct. 2499, 2510 (2007), the Supreme Court held that a complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any

opposing inference once could draw from the facts alleged." However, in Lormand, 565 F.3d at 267, the Fifth Circuit held that the PSLRA did not heighten pleading standards for all six elements of securities fraud. The Fifth Circuit explained that the plain text of 15 U.S.C. § 78u-4(b)(4) provides only that "the plaintiff shall have the burden of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." Id. at 257 n.18. Nothing in this language expressly or impliedly heightens the standard of pleading to loss causation. Thus, when considering a motion to dismiss, courts are "not authorized or required to determine whether the plaintiff's plausible inference of loss causation [under 15 U.S.C. § 78u-4(b)(4)] is equally or more plausible than other competing inferences, as [they] must in assessing allegations of scienter under the PSLRA." Id. at 267.

The PSLRA contains a safe harbor provision that protects individuals and corporations from liability for certain forward-looking statements that later prove false. To qualify for this protection, the statement at issue must be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or be "immaterial." 15 U.S.C. § 78u-5(c)(1)(A)(i, ii). "To avoid the safe harbor, plaintiffs must plead facts demonstrating that the statement was made with

actual knowledge of its falsity." Southland, 365 F.3d at 371 (citing 15 U.S.C. § 78u-5(c)(1)(B), and Nathenson v. Zonagen, Inc., 267 F.3d 400, 409 (5th Cir. 2001)).

## III. Analysis

Defendants argue that the securities claims asserted against them should be dismissed because plaintiffs have failed to satisfy the pleading requirements for stating either a primary claim under § 10(b) or Rule 10b-5, or a claim for control person liability under § 20(a). Defendants argue that "[p]laintiffs have failed to (1) establish that Defendants made any actionable misstatement; (2) identify any valid corrective disclosure that establishes loss causation; or (3) raise a strong inference of Defendants' intent to defraud."[6] Defendants also argue that plaintiffs' control-person claims against the individual defendants, Killion and Tomz, under § 20(a) fails as a matter of law because plaintiffs have failed to state a primary securities violation under §10(b) or Rule 10b-5.[7]

---

[6] Id. at 1.

[7] Id. at 25.

13

**A.   Plaintiffs' Claims for Violation of § 10(b) and Rule 10b-5**

1.   <u>Allegations of Falsity</u>

The statements that plaintiffs allege were false and misleading occurred on three different dates: December 7, 2012, February 26, 2013, and April 30, 2013.[8] Defendants argue that the statements alleged in the ACAC to be false or misleading are not actionable because plaintiffs have either failed to allege facts capable of proving that the statements were false or misleading, or because the statements that turned out to be false were forward-looking statements protected by the PSLRA's safe-harbor.[9]

(a)   The December 7, 2012, Statements Are Not Actionable

Plaintiffs allege that on December 7, 2012, Uni-Pixel issued a Press Release entitled, "Uni-Pixel and Major PC Maker Enter Multi-Million Dollar Preferred Price and Capacity License Agreement to Introduce Products with UniBoss-based Touch Screens." (ACAC ¶ 60) In relevant part the Press Release stated (1) "Uni-Pixel has granted the PC maker a limited exclusive license in the notebook market segment for UniBoss Performance Engineered Film Technology

---

[8]Lead Plaintiffs' Opposition, Docket Entry No. 26, p. 15 (citing ACAC ¶¶ 61, 66-69 (Dec. 7, 2012, PC deal announcement); 74-79, 80-82, 83-86 (Feb. 26, 2013, press release, conference call, and Form 10-K); 107-109 (April 30, 2013, statement that UniBoss would reach store shelves in September and Form 10-Q "work in progress" figure).

[9]Defendants' Motion to Dismiss, Docket Entry No. 24, 1, 6-17.

that provides the licensee priority development, dedicated production capacity and preferred pricing," and (2) "[t]he license can be extended to the PC maker's supply chain, including third-party manufacturing partners, touch panel module manufacturers, controller manufacturers, LCD makers and original design manufacturers." (ACAC ¶ 60)  Plaintiffs allege that the Press Release quoted Killion as stating:

> ***The preferred price and capacity license agreement furthers Uni-Pixel's stated go-to-market strategy.*** Our strategy includes offering reduced pricing, dedicated production capacity and limited exclusives to licensees, while enabling Uni-Pixel to expand production capacity.
>
> ***The license agreement also represents a major step towards a worldwide commercialization of our UniBoss touch screen technology.*** . .

(ACAC ¶ 61)  The Press Release also stated that the "[t]erms of the agreement and the name of the PC maker are confidential." (ACAC ¶ 62)  Plaintiffs allege that Uni-Pixel "filed the press release with the SEC as an exhibit to a Form 8-K, thereby acknowledging that the contract was a 'material definitive agreement,' but stated: 'The terms of the agreement and name of the PC maker are confidential.'" (ACAC ¶ 62)

Plaintiffs allege that upon issuance of the December 7, 2012, Press Release, Uni-Pixel's stock rose nearly 12% from a prior close of $8.26 per share on December 6, 2012, to a close of $9.25 per share on December 7, 2012. (ACAC ¶ 63)  The following Monday, December 10, 2012, Mike Malouf, an analyst for the Craig-Hallum

Capital Group, issued a report entitled, "Game Changing Partnership Agreement Signed.  Raising Estimates, Reiterating Buy Rating and Raising Price Target from $13 to $22." (ACAC ¶ 64)  Plaintiffs allege that on December 10, 2012, Uni-Pixels' share price closed at $15.07 per share, on nearly three times the volume of trading on December 7, 2012.  (ACAC ¶ 65)

Plaintiffs neither allege nor argue that the statements contained in the December 7, 2012, Press Release were false. Instead, plaintiffs allege that the statements in the Press Release misled the market to believe that (1) "Uni-Pixel had significant purchaser interest in UniBoss, thus the need to enter into a partnership to fund more rapid ramp-up of mass production," and (2) UniBoss [] was ready for 'world-wide commercialization' that would lead to both revenue and earnings in 2013." (ACAC ¶ 66)  In support of their allegations that statements in the Press Release misled the market, plaintiffs cite statements made in the Craig-Hallum analyst report published on December 10, 2012, stating that without a partnership Uni-Pixel could achieve production schedules of only 175,000 units monthly, but with a partner, production schedules could rise to 1.3 million units monthly.[10]  (ACAC ¶ 64(d)) Plaintiffs argue that the Craig-Hallum report also speculated that customer interest for more than 175,000 units a month already

---

[10]See Lead Plaintiffs' Opposition, Docket Entry No. 26, p. 6 (citing ACAC ¶ 64).

existed.[11]  However, in response to defendants' motion to dismiss,
plaintiffs acknowledge that the information and speculation
expressed in the Craig-Hallum report were not based on statements
contained in the December 7, 2012, Press Release as alleged in the
ACAC but, instead, on "details [of the agreement that] *were*
discussed during a *private* call . . . hosted by the underwriter of
Uni-Pixel's August 2012 stock offering, Craig Hallum."[12]

Missing from the ACAC, however, are allegations that the
defendants exercised control over any of the statements in the
Craig-Hallum analyst report, or allegations that statements in the
report were attributed to the defendants, adopted by the
defendants, or used by the defendants as conduits to the market.
Absent such allegations, defendants cannot be held liable for
statements made in a report published by an outside analyst.  See
Southland, 365 F.3d at 373-75 (company defendants could not be held
accountable for forward-looking statements in a broker's report
unless the statements were attributed to the defendants, adopted by
the defendants, or used by the defendants as conduits to the market
because such statements represented the broker's own opinion as to
the company's future performance); In re Capstead Mortgage

---

[11]Id.  (citing ACAC ¶ 64(d)("Because this partnership was
formed, the analyst concluded not only that the second schedule was
achievable, but that there must be customer interest for more than
175,000 units per month.")).

[12]Id.

Securities Litigation, 258 F. Supp.2d 533, 562 (N.D. Tex. 2003)("[T]o hold a defendant liable for misleading statements published by a third party, the plaintiff must at least identify the defendant who provided the information that the third party made public to the market."); In re Securities Litigation BMC Software, Inc., 183 F. Supp.2d 860, 893 (S.D. Tex. 2001) (plaintiffs must plead facts "demonstrating that Defendants exercised control over any of the analysts' comments").

Because the Craig-Hallum analyst report was not based on the December 7, 2012, Press Release but, instead, on a private conference call, the Craig-Hallum analyst report does not support plaintiffs' allegations that statements contained in the December 7, 2012, Press Release were misleading. Since plaintiffs do not allege that statements contained in the December 7, 2012, Press Release were false, and plaintiffs' only allegations that the December 7, 2012, Press Release mislead the market are based on the Craig-Hallum analyst report, the ACAC does not allege facts capable of proving that statements made in the December 7, 2012, Press Release were false or misleading. Accordingly, statements made in the December 7, 2012, Press Release are not actionable under the federal securities laws.

(b)   The   February   26,   2013,   Manufacturing   Capacity   and
Commercial Release Forecasts

Plaintiffs allege that on February 26, 2013, Uni-Pixel filed

an SEC Form 10-K for the year ending December 31, 2012, issued a

Press Release, and conducted a conference call with analysts, all

of which contained false and misleading statements about UniBoss.

Plaintiffs allege that on February 26, 2013, Uni-Pixel filed an

annual report for the year ended December 31, 2012, on Form 10-K

with the SEC, which made the following misstatements about UniBoss:

> . . . *The UniBoss™ production process enables the
> printing of fine line conductor patterns on flexible film
> substrates.  This process can produce ultra-fine line
> (~5µm width) conductive lines and patterns that can be
> used for many printed circuit applications.* . .
>
> **Successful Prototypes: . . .** *During 2012, we debuted
> several fully functional UniBoss touch sensor prototypes.*
> . .   (ACAC ¶ 84)

Plaintiffs allege that on the same day Uni-Pixel issued a Press

Release announcing its financial results for the Q4 2012 and FY

2012 which quoted Killion as stating in relevant part:

> We are addressing the large market opportunity of UniBoss
> by leveraging licensees and partner infrastructure in
> order to scale our manufacturing capacity quickly to meet
> anticipated demand while maintaining a very efficient
> organizational structure with UniPixel. . .
>
> . . .
>
> *Given our strong progress, we expect to recognize
> approximately $5 million in revenue in the current first
> quarter.  We are planning to begin limited production in
> the second quarter and ramp up to volume production in
> the third.  We are targeting 60,000 units or square feet
> per month by the end of April, 200,000 by the end of*

*June, 700,000 by the end of September and then achieving 1.3 million units monthly by January of 2014.*

In 2012 we achieved production-level qualification of our Diamond Guard(TM) Hard Coat film with our manufacturing and distribution partner, Carestream Tollcoating. The unique performance characteristics of Diamond Guard make it an ideal cover glass alternative and decorative graphics scratch-resistant film. Given our current focus on the greater opportunity with UniBoss, we see UniBoss driving initial Diamond Guard adoption as an integrated touch screen solution. (Emphasis added.)

(ACAC ¶ 74)

Plaintiffs allege that during a conference call with analysts held after the close of business Killion restated the forecast targets from the Press Release (ACAC ¶ 75), provided false and misleading responses to a question about future production by stating that "first products are scheduled to be in the market in a product by September timeframe," (ACAC ¶ 80), and stated that the prediction for products with UniBoss to be on the shelf in September depended on Uni-Pixel's ability to deliver product to manufacturers in April. (ACAC ¶ 81) Plaintiffs also allege that during the conference call Killion failed to correct a misstatement made by Senior Vice-President and Chief Technology Officer, Bob Petcavich, i.e., that "the line is actually running, we're actually running roll-to-roll material off the line now. We do have a recipe for product that we are bringing off the line as we speak even this afternoon and we don't see any road blocks to meeting or exceeding that 60,000 units per month in April." (ACAC ¶ 76)

20

Plaintiffs allege that these and other statements made by the defendants on February 26, 2013,

> gave the false impression that Uni-Pixel could quickly ramp up production to 60,000 units a month in the next 60 days (*i.e.*, by the end of April), and then even more rapidly after that point, because Uni-Pixel had installed the equipment in late December and had been calibrating it such that, by late February, Uni-Pixel had developed a "recipe" for the roll-to-roll product currently being produced on the line — a recipe which could easily be replicated to bring up new lines "within weeks" after equipment delivery. Based on the experience of C[onfidential] W[itness] 1, who left Uni-Pixel *after* the conference call, no recipe had yet been developed to standardize production — indeed, the process changed on a daily basis — and, despite having fewer steps than a subtractive photolithography process, Uni-Pixel's yields were only between 20%-40%. Consequently, the scheduled ramp up of 60,000 units by the end of April — and an even steeper ramp up thereafter — was not possible. (ACAC ¶ 77)

Plaintiffs allege that based on the statements that the defendants made about UniBoss on February 26, 2013, Uni-Pixel's stock price rose $4.00, over 21% from a close of $18.80 per share on February 26, 2013, to a close of $22.80 per share on February 27, 2013. (ACAC ¶ 87) Plaintiffs allege that Uni-Pixel shares gained another $0.80 the next day to close at $23.60. (ACAC ¶ 87)

Plaintiffs' allegations that defendants' February 26, 2013, statements were false and misleading are based on information provided by a confidential witness (CW1) who plaintiffs allege was a "Lab Technician employed at Uni-Pixel from mid-2012 until the spring of 2013." (ACAC ¶ 67) Plaintiffs allege that

> CW1 reported to a Chemical Engineer, Evan Goldberg, who reported to Chief Technical Officer Robert Petcavich, who

reported to CEO Killion. . . CW1 worked in the lab, doing both production and testing, with a senior technical, Robyn Kemp, and Terry Kennair. CW1's duties included platting, preparing solutions and samples, maintaining the lab and equipment and assisting senior personnel."

(ACAC ¶ 67 & n.2)  Plaintiffs allege that

until the time of CW1's departure, defendants were always changing the UniBoss process — sometimes daily or even twice in a single day — because they could never get it down pat.  Frequent problems included:

    a.    Machine jams and improper "plating" on the press, requiring manual adjustment;

    b.    Even when jams and plating problems were corrected, product that looked good was later reported by the client to have a low yield — indeed, yields were only 20-40%;

    c.    While larger print samples could be reliably made which were uniform and fully conductive, the smaller the pattern size, the more likely it was to be non-uniform and have microscopic breaks;

    d.    The goal of shrinking the pattern size down to the desired level of thinness — because everyone knew that the lines were visible and that a Moire effect was evident in the larger print — remained elusive regardless of materials used;

    e.    Additional testing to catch problems before shipping samples to clients was problematic — as too much testing and handling could cause broken lines and destroy the product; and

    f.    Management had "overpromised" product on delivery schedules that could not be met and needed to be pushed out.  The team tweaked the product to reduce errors as the deadline would approach; once the product finally looked very good, the first production sample would fail. Comments about having too tight a delivery schedule were made by Godlberg, Kemp and

Director of Chemistry and Photonic Materials, Dan Jin.  (ACAC ¶ 67)

### (1)   The Form 10-K Statements Are Not Actionable

Plaintiffs complain about the Form 10-K's statements regarding the ability of the UniBoss process to produce ultra-fine lines (~5μm width), and the debut of fully functional prototypes in December of 2012.  But plaintiffs fail to allege facts capable of proving that the UniBoss process could not produce such ultra-fine lines, or that fully functional prototypes were not debuted in December 2012.  Instead, plaintiffs allege that according to CW1, the smaller the pattern size, the more likely it was to be non-uniform and have microscopic breaks, and the goal of shrinking the pattern size down to the desired level of thinness remained elusive.  Plaintiffs allege that these statements "misled investors into believing that the production process had been standardized at the time of the [SEC] filing — when it had not — and that small, thin prototypes were fully functional when only the larger samples were uniform and fully conductive."  (ACAC ¶ 85)  Missing from plaintiffs' ACAC are allegations of fact capable of proving that the desired level of thinness that remained elusive was the width stated in the Form 10-K, or that the problems identified by CW1 prevented Uni-Pixel from debuting a fully functional prototype in December of 2012.  Thus, accepting as true CW1's representation of problems with the UniBoss process, plaintiffs have failed to allege

facts capable of proving that statements in the February 26, 2013,
Form 10-K about which they complain were false or misleading.

> **(2)   The   Press   Release   and   Conference   Call
> Statements Attributed to Defendant Killion Are
> Actionable**

Plaintiffs   complain   that   in   a   Press   Release   issued   on
February 26, 2013, and during a conference call held that same day,
defendants   made   false   and   misleading   statements   regarding   Uni-
Pixel's   efforts   to   scale   its   manufacturing   capacity   to   meet
anticipated demand by targeting 45,000 to 60,000 units per month by
the end of April, 200,000 by the end of June, 700,000 by the end of
September and 1.3 million units per month by January of 2014, and
having   products   with   UniBoss   on   store   shelves   by   September.
Plaintiffs allege that during a conference call held on April 30,
2013,   Killion   stated   that   actual   production   during   the   first
quarter   was   far   below   these   forecasts   made   in   February.    In
pertinent part plaintiffs allege that Killion stated in April: "the
initial   shipment   quantities   on   the   production   started   at   50"   (ACAC
¶ 106) and "we started by shipping 50 units for a beta build-out or
alpha build-out."   (ACAC ¶ 107).

In   hindsight,   the   forecasts   that   defendants   made   on
February   26,   2013,   thus   turned   out   to   be   incorrect;   but
incorrectness   alone   does   not   mean   that   the   February   26,   2013,
forecasts   are   actionable.   See <u>Lovelace</u>, 78 F.3d at 1020 n.4, (to

be actionable, statements must be "materially false or misleading when made"). "For securities fraud cases, '[a]n opinion or prediction is actionable if there is a gross disparity between prediction and fact.'" Spitzberg v. Houston American Energy Corp., ____ F.3d _____, 2014 WL 3442515, *11 & n.24 (5th Cir. July 15, 2014) (quoting Lormand, 565 F.3d at 248 & n.13 (quoting First Virginia Bankshares v. Benson, 559 F.2d 1307, 1314 (5th Cir. 1977)). See also id. at n.24 (citing with approval: Reese v. Malone, 747 F.3d 557, 579 (9th Cir. 2014) ("A statement of belief is a factual misstatement actionable under Section 10(b) if (1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." (citation and quotation marks omitted)); In re Merck & Co., Inc. Securities, Derivative & "ERISA" Litigation, 543 F.3d 150, 166 (3d Cir. 2008) ("We have explained that for misrepresentations in an opinion or belief to be actionable, plaintiffs must show that the statement was issued without a genuine belief or reasonable basis . . ." (citation and internal quotation marks omitted)), aff'd sub nom. Merck & Co., Inc. v. Reynolds, 130 S. Ct. 1784 (2010)).

Plaintiffs allege that the forward looking projections for manufacturing capacity and commercial release of UniBoss that the February 26, 2013, Press Release attributed to Killion, and that

Killion restated during the February 26, 2013, conference call, ranged from 45,000 to 60,000 units by April, while the actual number of units produced and shipped in April was only 50. Moreover, plaintiffs allege that according to CW1, management

> "overpromised" product on delivery schedules that could not be met and needed to be pushed out. The team tweaked the product to reduce errors as the deadline would approach; once the product finally looked very good, the first production sample would fail. Comments about having too tight a delivery schedule were made by Godlberg, Kemp and Director of Chemistry and Photonic Materials, Dan Jin.

(ACAC ¶ 67)   The information provided by CW1 conflicts with defendants' February 2013 forecasts regarding Uni-Pixel's ability to meet an admittedly "aggressive production timeline."[13]  Because CW1's statements address the circumstances underlying the February forecasts, they do not merely indicate a disagreement between the parties over the validity of the defendants' forecasts as defendants argue;[14] but, instead, support plaintiffs' allegations that the forecasts were false when made. Moreover, the disparity between the defendants' February forecasts and the number of units

---

[13]See Defendants' Reply in Support of their Motion to Dismiss ("Defendants' Reply"), Docket Entry No. 27, p. 9.

[14]See Defendants' Motion to Dismiss, Docket Entry No. 24, p. 25 ("These allegations, even if taken as true, establish only that these mid-level employees believed that the capacity timelines were 'too tight.' . . . Nothing in the AC ties these statements to Defendants, and it is entirely plausible that a mid-level employee would feel that production capacity timelines were too short while upper-level management believed that the timelines were possible.").

actually produced and shipped in April is sufficiently large to make the defendants' false forecasts actionable. See Spitzberg, __ __ F.3d at ___, 2014 WL 3442515, *11 ("[F]or securities fraud cases, '[a]n opinion or prediction is actionable if there is a gross disparity between prediction and fact.'"). Regardless of whether plaintiffs can prove their allegations that the defendants' February 2013 forecasts were false and misleading when made during later stages of this litigation, plaintiffs' have identified "each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading" as required under 15 U.S.C. § 78u-4(b)(1). Thus, the court concludes that the plaintiffs have satisfied the requirements for pleading that defendants' February 2013 manufacturing capacity and commercial release forecasts were false and misleading when made.

Defendants argue that even if their forecasts concerning manufacturing capacity and commercial release of the UniBoss product were false or misleading, they are not actionable because they are predictions of future performance that were accompanied by meaningful cautionary language and, as such, are protected by the PSLRA's safe harbor for false or misleading forward-looking statements. 15 U.S.C. § 78u-5(c)(1)(B). Plaintiffs respond that even if the allegedly false and misleading forecasts were forward looking statements accompanied by meaningful cautionary language, the PSLRA's safe harbor provision does not apply because defendants

made the forecasts with actual knowledge of their falsity.[15] Plaintiffs' argument rests on the list of manufacturing problems identified by CW1, one of which was that "[m]anagement had 'overpromised' product on delivery schedules that could not be met and needed to be pushed out." (ACAC ¶ 67) Plaintiffs allege

> [w]hile CW1 was employed at Uni-Pixel there were weekly and daily meetings with department heads, which CW1 sometime attended; other meetings, with more senior personnel, CW1 did not attend. CW1's superior, Goldberg, attended those meetings and, afterward, told CW1 to make changes to the production process based upon information exchanged at the meetings. CEO Killion attended all meetings and was aware of everything that happened at Uni-Pixel; CFO Tomz attended some but not all of the meetings. By the spring of 2013, there were meetings nearly every day — after which the printing team would go through a run down for the day and devise a plan as to what to change the next day.

(ACAC ¶ 68) Plaintiffs argue that these allegations are capable of proving defendants' actual knowledge that their February 2013 forecasts were false when made because the individual defendants,

> senior executives of a 30-person company, attended all (Killion) or many (Tomz) of the weekly, and later daily, meetings within the Company at which fundamental problems with both the product and the production process for the Company's only product were discussed — along with potential solutions.[16]

Defendants argue plaintiffs' allegations are not sufficient to prove either that they knew about the manufacturing problems

---

[15]Lead Plaintiff's Opposition, Docket Entry No. 26, p. 20.

[16]Lead Plaintiff's Opposition, Docket Entry No. 26, p. 20 (citing KB Partners I, L.P. v. Barbier, 907 F. Supp.2d 826, 831 (W.D. Tex. 2012) (attendance at meetings where problems discussed sufficient to allege actual knowledge of the problems).

identified by CW1 in February 2013 when they made the forecasts, or
that even if they did know about those problems, they did not, in
fact, believe that the problems were routine aspects of finalizing
a manufacturing process and not issues that would prevent Uni-Pixel
from meeting the predicted capacity and production timeline.[17]

Defendants argue that

> [f]ar from alleging issues that would have "ma[de] it
> impossible for Uni-Pixel to meet its promised
> commercialization deadline" as Plaintiff claims, the CW's
> *actual* allegations are far more modest. (Opp. at 3.)
> The CW alleged five particular issues: 1) machine jams
> and improper plating; 2) yields between 20-40%;
> 3) product with a smaller pattern size was more likely to
> have breaks; 4) Uni-Pixel was still trying to decrease
> the size of its printed pattern; and 5) testing
> techniques used sometimes damaged product.
>
> Machine jams, yield percentage, testing, and the
> effect of pattern size are the typical issues that a
> development-stage company would expect to encounter as it
> transitioned to a manufacturing company. Notably, the CW
> does not allege that he (or anyone else at Uni-Pixel)
> told Mr. Killion that the capacity and production targets
> were unattainable. The CW's allegations do not raise an
> inference that Defendants actually knew that Uni-Pixel
> would not produce commercial product in 2013. . . .
> Therefore, even if taken as true, the more plausible
> interpretation of these issues is that they were a part
> of the routine process of finalizing a product for
> commercial production, not "red flags" that warned
> Defendants that meeting their production timeline was
> impossible.[18]

Although defendants list most of the manufacturing problems
identified by CW1, defendants fail to mention CW1's statement that

---

[17]Defendants' Reply, Docket Entry No. 27, pp. 9-11.

[18]Id. at 10-11.

"[m]anagement . . . 'overpromised' product on delivery schedules
that could not be met and needed to be pushed out."  (ACAC ¶ 67)
Moreover, defendants' argument that they could not have known about
the problems identified by CW1 because CW1 "does not allege that he
(or anyone else at Uni-Pixel) told Mr. Killion that the capacity
and production targets were unattainable,"[19] lacks persuasive force
due to Uni-Pixel's small size, and the importance of UniBoss to
Uni-Pixel's future prospects.

Plaintiffs allege, and the Form 10-K filed on February 26,
2013, states that Uni-Pixel had only 27 full-time employees.
Plaintiffs' argument that Uni-Pixel was largely a one-product
company is supported by their allegations that the February 26,
2013, Press Release identifies another company product, i.e.,
Diamond Guard, but states: "Given our current focus on the greater
opportunity with UniBoss, we see UniBoss driving initial Diamond
Guard adoption as an integrated touch screen solution." (ACAC ¶ 74)
In Spitzberg, ____ F.3d at ____, 2014 WL 3442515, *14 & n.13, the
Fifth Circuit rejected defendants' argument that plaintiffs'
allegations that defendants knew certain statements were false when

---

[19]Id. at 11.  See also Defendants' Motion to Dismiss, Docket
Entry No. 24, p. 25 ("These allegations, even if taken as true,
establish only that these mid-level employees believed that the
capacity timelines were 'too tight.' . . Nothing in the AC ties
these statements to Defendants, and it is entirely plausible that
a mid-level employee would feel that production capacity timelines
were too short while upper-level management believed that the
timelines were possible.").

made impermissibly relied on "the collective knowledge of all the corporation's officers and employees."  The Fifth Circuit said,

> [w]e reject this argument, as the district court did, due to the extremely small size of the company at issue.  As the complaint plausibly alleges, "[b]y virtue of their positions at Houston American, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth. . .  As the senior managers and/or directors of Houston American, the Individual Defendants had knowledge of the details of Houston American's internal affairs."

Id.  The same is true here; by virtue of their positions, the individual defendants, Killion and Tomz, as senior managers of Uni-Pixel, had actual knowledge of the details of Uni-Pixel's internal affairs, including, inter alia, the problems identified by CW1.  See also Nathenson, 267 F.3d at 424-25 (acknowledging that normally an officer's position within a defendant company does not suffice to create an inference of scienter, but concluding that special circumstances capable of supporting a different result exist where the defendant company had only three dozen full-time employees, was essentially a one-product company, and the alleged misrepresentations were about the patent protection for that one product).  Thus, defendants' February 2013 manufacturing capacity and commercial release forecasts are not eligible for the PSLRA's safe harbor because plaintiffs have alleged facts capable of proving that when defendants made these forecasts, defendants had actual knowledge of their falsity.

31

(c)   The April 30, 2013, Statements Are Not Actionable

Plaintiffs allege that on April 30, 2013, Uni-Pixel filed an SEC Form 10-Q for the quarter ending March 31, 2013, issued a Press Release, and conducted a conference call with analysts.  Plaintiffs allege that defendants made actionable false and misleading statements about UniBoss in the Form 10-Q and in response to questions posed during the conference call, and that Uni-Pixel's share price fell on both April 30, and May 1, 2013, from $36.20 on April 29, 2013, to $35.55 on April 30, 2013, and to $33.22 on May 1, 2013. (ACAC ¶ 113)   Plaintiffs' allegations of the statements made on the April 30, 2013, appear under the heading, "THE TRUTH BEGINS TO EMERGE." (ACAC above ¶ 105)   Although plaintiffs allege that some of the statements made by defendants on April 30, 2013, were false and misleading, none of these statements are actionable because plaintiffs have not alleged that after these statements, Uni-Pixel's share price increased.  Instead, plaintiffs allege that beginning on this date, Uni-Pixel's share prices started the precipitous fall for which they seek damages.   In Nathenson, 267 F.3d at 418, the Fifth Circuit held that allegedly false and misleading statements that did not favorably effect share price are not actionable under a fraud-on-the-market theory.  Since plaintiffs here rely "upon the presumption of reliance established by the fraud-on-the-market doctrine" (ACAC ¶ 127), the court concludes that the April 30, 2013, statements about which

plaintiffs complain are not actionable because plaintiffs have not
alleged any facts capable of proving that these statements had a
favorable effect on Uni-Pixel's share price.


   2.   Scienter

   Defendants argue that they are entitled to dismissal of the
§ 10(b) and Rule 10b-5 claims asserted against them because
plaintiffs have failed to raise a strong inference of scienter.[20]
In this circuit the term "scienter" is defined as a mental state of
mind embracing "intent to deceive, manipulate or defraud or severe
recklessness." Lormand, 565 F.3d at 251 (quoting Indiana Electric,
537 F.3d at 533). "Severe recklessness" is

        limited to those highly unreasonable omissions or
        misrepresentations that involve not merely simple or even
        inexcusable negligence, but an extreme departure from the
        standards of ordinary care, and that present a danger of
        misleading buyers or sellers which is either known to the
        defendant or is so obvious that the defendant must have
        been aware of it.

Indiana Electric, 537 F.3d at 533.   Under the PSLRA, 15 U.S.C.
§ 78u-4(b)(2), plaintiffs must "state with particularity facts
giving rise to a strong inference that the defendant[s] acted with
the required state of mind." "[I]n determining whether the pleaded
facts give rise to a 'strong' inference of scienter, the court must
take into account plausible opposing inferences." Lormand,
565 F.l3d at 251.  In Tellabs, 127 S. Ct. at 2510, the Supreme

_____

        [20]Defendants' Motion to Dismiss, Docket Entry No. 24, p. 1.

                                   33

Court held that a complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." The critical issue in a motion to dismiss based on insufficient allegations of scienter "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. at 2509 (citing Abrams v. Baker Hughes Inc., 292 F.3d 424, 431 (5th Cir. 2002)).

Defendants argue that plaintiffs reliance on speculation by a low-level former employee, in conjunction with the exercise of a small percentage of stock options by insiders, are insufficient to demonstrate that any misstatements were made with scienter.[21] Assuming the truth of CW1's statements regarding the manufacturing problems that Uni-Pixel was experiencing in the Spring of 2013, and CW1's statement that management "overpromised" product on delivery schedules that could not be met and needed to be pushed out (ACAC ¶ 67), defendants' statements that Uni-Pixel planned

> to begin limited production in the second quarter and ramp up to volume production in the third. We are targeting 60,000 units or square feet per month by the end of April, 200,000 by the end of June, 700,000 by the

---

[21]Id. at 22-25. See also Defendants' Reply, Docket Entry No. 27, pp. 9-11.

end of September and then achieving 1.3 million units monthly by January of 2014,[22]

would have been misleading to investors. The gross disparity between the defendants' predictions and Uni-Pixel's actual results, i.e., only 50 units were produced in April, coupled with the profits that not only the individual defendants but also other outsiders made by selling stock in March of 2013, raises a strong inference that defendants' false and misleading predictions about the manufacturing capacity and commercial release of UniBoss were made with scienter.

Defendants' argue that even if they were aware of all of CW1's allegations, plaintiffs' allegations of scienter fail because "the more plausible opposing inference is that — as managers of the Company — they believed that these were routine aspects of finalizing a manufacturing process and not issues that would keep Uni-Pixel from meeting its capacity targets,"[23] or "'red-flags' that warned [d]efendants that meeting their production timeline was impossible."[24] Whether defendants actually believed that Uni-Pixel could solve the manufacturing problems identified by CW1 and achieve the capacity and production targets that they themselves characterize as "aggressive," and, if so, whether that belief was

---

[22]ACAC ¶ 74 (quoting Press Release issued on February 26, 2013).

[23]Defendants' Reply, Docket Entry No. 27, p. 10.

[24]Id.

35

reasonably, is irrelevant at this stage of an action under Rule 10b-5 and the PSLRA.  The issue is whether plaintiffs have alleged facts capable of proving that defendants were severely reckless when they allegedly misled investors regarding Uni-Pixel's ability to quickly ramp-up manufacturing capacity to 60,000 units in April, and to have UniBoss on store shelves in September.  See Spitzberg, _____ F.3d at _____, 2014 WL 3442515, *6 (asserting that what defendants actually believed was irrelevant to whether plaintiffs have alleged that defendants' false and misleading statements were severely reckless).

Even if defendants' subjective beliefs support a strong inference as to a lack of scienter, 15 U.S.C. § 78u-4(b)(2) is nonetheless satisfied because the competing inference of severe recklessness is at least as cogent and compelling.  The Fifth Circuit has recognized that where competing inferences establish or negate the scienter requirement, "a tie favors the plaintiff" on a motion to dismiss under 15 U.S.C. § 78u-4(b)(2).  See Spitzberg, __ F.3d at ___, 2014 WL 3442515, *7, and Lormand, 565 F.3d at 254 (analyzing Tellabs, 127 S. Ct. at 2510).  For these reasons, the court concludes that plaintiffs have sufficiently pled circumstances constituting at least severe recklessness with respect to the forecasts of manufacturing capacity and commercial release of UniBoss made in the Press Release issued on February 26, 2013, and made by Killion in responses to questions posed during

the conference calls held on February 26, and April 30, 2013. Accordingly, defendants' motion to dismiss cannot be granted based on plaintiffs' failure to plead scienter as to defendants Uni-Pixel and Killion. See Southland, 365 F.3d at 366-67 (recognizing that false or misleading statements made by a corporate officer with sufficient authority may be attributable to the corporation). Since, however, plaintiffs have failed to allege facts capable of proving that Tomz made any false or misleading statements, or did so knowing that the statements were false when made, defendants' motion to dismiss Tomz will be granted.

### 3.   Loss Causation

Under the PSLRA, a plaintiff must prove that a defendant's act or omission alleged to have violated federal securities laws "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). Loss causation refers to a direct link between the misstatement and a plaintiff's loss, and generally requires a corrective disclosure relating to the challenged representations, followed by a decline in the stock's price. See Spitzberg, ____ F.3d ____. 2014 WL 3442525,*8 n.18. In Dura Pharmaceuticals, Inc. v. Broudo, 125 S. Ct. 1627, 1633-34 (2005), the Supreme Court held that loss causation incorporates traditional elements of proximate causation and economic loss. See Amgen,

133 S. Ct. at 1192, (confirming that loss causation continues to be an element of a claim under § 10(b)).

The parties disagree as to what disclosures are needed to satisfy § 10(b)'s loss causation requirement.  The Fifth Circuit addressed this issue in <u>Alaska Electrical Pension Fund v. Flowserve, Corp.</u>, 572 F.3d 221 (5th Cir. 2009).  The defendants in that case argued that to prove loss causation, a plaintiff was required to show a "fact-for-fact" disclosure of information that fully corrected prior alleged misstatements.  The plaintiffs argued that it was sufficient to show that the "true [] condition" of the company became publicly apparent, regardless of whether that condition corrected past misstatements.  The Fifth Circuit held that neither position was entirely correct.  The defendants were incorrect because

> "[i]f a fact-for-fact disclosure were required to establish loss causation, a defendant could defeat liability by refusing to admit the falsity of its prior misstatements. . .  And if a 'complete' corrective disclosure were required, defendants could immunize themselves with a protracted series of partial disclosures."

<u>Id.</u> at 230.  The plaintiffs were incorrect because "undisclosed information cannot drive down the market price of a stock."  <u>Id.</u> The court held that "to establish loss causation, this disclosed information must reflect part of 'the relevant truth' — the truth obscured by the fraudulent statements."  <u>Id.</u>  <u>See also</u> <u>Lormand</u>, 565 F.3d at 261 ("[L]oss causation may be pleaded on the theory that

the truth gradually emerged through a series of partial disclosures and that an entire series of partial disclosures caused the stock price deflation."). "But loss caused solely by a general impression in the market that 'something is wrong' is insufficient to establish causation." Flowserve, 572 F.3d at 232.

Plaintiffs identify five allegedly corrective disclosures that caused their loss: (1) the April 30, 2013, Press Release announcing first quarter 2013 results disclosing that by the end of April only 50 samples of UniBoss had been produced and shipped to potential customers (ACAC ¶ 106); (2) a Barron's article about Uni-Pixel published on May 11, 2013, titled, "Out of Touch?" stating in pertinent part that "a history of product disappointments suggest investors should be wary" (ACAC ¶ 115); (3) a May 20, 2013, Press Release announcing that product shipment had been delayed (ACAC ¶ 120); (4) a Seeking Alpha article published on May 30, 2013, titled, "Musings On Minneapolis: Uni-Pixel is Moving . . . Backwards" reporting that "when pressed by an audience member as to when purchase orders for production quantities will materialize, [Uni-Pixel's CTO,] Petcavich eventually admitted that there is 'no timeline on any purchase orders;'" and (5) a Seeking Alpha article published on May 31, 2013, titled, "Uni-Pixel: A Picture is Worth A Thousand Words," stating that the authors had handled the UniBoss product and found that it did not work (ACAC ¶ 123).

Defendants argue that although plaintiffs identify five so-called

> "corrective disclosures" that supposedly reveal prior
> fraud to the market, in reality none of these five
> disclosures presents new, public information that is
> linked to any alleged prior misstatement actionable under
> the federal securities laws.[25]

Defendants argue that plaintiff's ACAC should be dismissed because plaintiffs have failed to "allege a single corrective disclosure that meets its burden of pleading loss causation."[26] This argument is based on defendants' contention that plaintiffs have failed to allege that defendants made any actionable misstatements. Since the court has already concluded that plaintiffs' allegations that the forecasts for manufacturing capacity and commercial release of UniBoss made in the Press Release issued on February 26, 2013, as well as statements made by Killion regarding those forecasts, a prediction that UniBoss would be on store shelves in the September 2013 timeframe, and Killion's failure to correct similar forecasts made by Uni-Pixel's CTO Petcavich during an analyst conference call held on February 26, 2013, are actionable misstatements. Three of the corrective disclosures alleged by plaintiffs satisfy the requirements for pleading loss causation as to the alleged misstatements that the court has concluded are actionable: (1) the April 30, 2013, Press Release disclosing that by that date only 50

---

[25]Defendants' Motion to Dismiss, Docket Entry No. 24, p. 1.

[26]Defendants' Reply, Docket Entry No. 27, p. 13.

samples of UniBoss had been produced and shipped to potential customers (ACAC ¶ 106); (2) the May 20, 2013, Press Release announcing that product shipment had been delayed (ACAC ¶ 120); and (3) the Seeking Alpha article published on May 30, 2013, titled, "Musings On Minneapolis: Uni-Pixel is Moving . . . Backwards" reporting that "when pressed by an audience member as to when purchase orders for production quantities will materialize, [Uni-Pixel's CTO,] Petcavich eventually admitted that there is 'no timeline on any purchase orders.'"   Because each of these disclosures revealed corrective information that demonstrated defendants' actionable statements were not true, and because plaintiffs allege that after each of these disclosures Uni-Pixel's stock price fell, the court concludes that plaintiffs' have satisfied the requirements for pleading loss causation.

**B.   Plaintiffs Allegations of § 20 Control Person Liability Against Uni-Pixel and Killion**

Plaintiffs allege that Killion and Tomz are liable as "control persons" of Uni-Pixel under § 20(a) of the Exchange Act. (ACAC ¶¶ 139-44).   Section 20(a) imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder" for securities fraud.   15 U.S.C. § 78t(a). "Control person liability is secondary only and cannot exist in the absence of a primary violation."   Southland, 365 F.3d at 383.

41

Defendants' argument that the control person claims asserted in plaintiffs' ACAC are based on assertions that plaintiffs' primary claims under § 10(b) are subject to dismissal. Since, however, the court has concluded that the primary claims asserted against Uni-Pixel and Killion are not subject to dismissal, the court concludes that the § 20(b) claim that plaintiffs have asserted against Uni-Pixel and Killion are not subject to dismissal, but that those claims asserted against Tomz are subject to dismissal. Id. ("Control person liability is secondary only and cannot exist in the absence of a primary violation.").

The allegations constituting primary violations by Killion, who served at the time of the alleged misrepresentations as an executive officer of Uni-Pixel, are sufficient to support plaintiffs' allegations of control person liability against Uni-Pixel. Id. at 383-384 (recognizing that a corporation can have either respondeat superior or § 20(a) liability for the primary violations of its employees). While an individual defendant cannot have § 20(a) liability for their own statements, see id. at 384, an individual defendant can have § 20(a) liability for statements attributed to a corporate entity such as Uni-Pixel, e.g., for statements contained in press releases and SEC filings that are not attributable to any single individual but were clearly made on behalf of Uni-Pixel. Id. at 365 ("[r]especting the potential section 10(b) liability of [the company] itself . . . as all of the

individual defendants were executive officers . . . whose actions were intended to benefit [the company] . . . [the court] will treat as having been made by [the company] the particular complained of . . . [press] release[] issued in its name.").

### IV. __Conclusions and Order__

For the reasons explained above, the court concludes that plaintiffs have stated claims for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. §§ 78j(b), 78t(a) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against defendants Uni-Pixel and Reed J. Killion arising from false and misleading forecasts regarding manufacturing capacity and commercial release of UniBoss attributed to Killion in a Uni-Pixel Press Release issued on February 26, 2013, and made by Killion in response to questions posed during an analyst conference call held on February 26, 2013, but that plaintiffs have failed to state claims for which relief may be granted against any defendant arising from other statements alleged to be false and misleading. Accordingly, Defendants' Motion to Dismiss Plaintiffs' Amended Class Action Complaint, Docket Entry No. 24, is **GRANTED in PART** and **DENIED in PART**, and the claims asserted against defendant Jeffrey W. Tomz are **DISMISSED WITH PREJUDICE**.

SIGNED at Houston, Texas, this 25th day of July, 2014.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE